1817.

*Philadelphia.*

*Saturday,*
January 4.

## The Commonwealth *against* EBERLE and others.

FREDERICK EBERLE, and fifty-eight others, members of "the German Evangelical Lutheran Congregation "in and near the city of *Philadelphia,*" were indicted for a conspiracy to prevent by force of arms, the use of the English language in the worship of God, by the said congregation. The indictment was found at the Mayor's Court of the city of Philadelphia, at March Term, 1816, and removed to this Court, by *certiorari*, and tried before YEATES J. at *Nisi Prius.*

The indictment contained two counts. The first count charged, that the defendants, on the 26th *September*, 1815, were members of the "German Evangelical Lutheran Con- "gregation in and near *Philadelphia,*" and so being members of the said congregation, they unlawfully and wickedly combining, conspiring, and confederating together, to acquire for themselves unjust and illegal authority and power in the said congregation, and to distress, oppress, and aggrieve the peaceful citizens of this Commonwealth, also members of said congregation, and to prevent them from the free, proper, and lawful enjoyment of the rights and privileges thereof, afterwards, viz. on the day and year aforesaid, at the city of *Philadelphia*, aforesaid, unlawfully assembled and met together, and being so assembled and met together, did then, and there, unjustly, unlawfully, and oppressively, conspire, combine, confederate, and agree together, to prevent by force and arms, the use of the English language in the worship of Almighty God, among the said congregation, and for that purpose, did then, and there, wickedly, unlawfully, and oppressively, confederate and agree among themselves, and did then and there determine, and firmly bind themselves before God, and solemnly to each other, to defend, with their bodies and lives, the German divine worship, and to oppose by every means, lawful, or unlawful, the introduction of any other language into the churches; and the said *F. Eberle*, and others, and each of them, in pursuance of the said unlawful and oppressive conspiracy, combination,

Words used by one man in evidence against another, unless they are proved to be engaged in a common enterprise: but in such case they are evidence, though not conclusive. A motion for a new trial is an appeal to the discretion of the Court. Unless injustice be done, a new trial should not be granted. What a witness who has been examined for the Commonwealth, has been heard to say, as to the views and intentions of the prosecutors, is not evidence, where he is not shewn to be connected with the prosecutors, and the evidence is not offered to discredit him. *Query*, whether it is evidence on any ground but that of discrediting the witness: as he might himself be examined as to such views and intentions.

confederacy, and agreement, so formed and made, as aforesaid, afterwards, to wit, on the 6th *January*, 1816, at the city of *Philadelphia* aforesaid, at an election then and there held, by the members of the said congregation, for certain officers of the same, viz. for elders and wardens, did unlawfully, and oppressively, and with force and violence, riotously, and routously, make and raise, and cause to be made and raised, a great noise, tumult, riot, and disturbance; and then, and there, in further pursuance of the said unlawful and oppressive conspiracy, combination, confederacy, and agreement so formed and made, as aforesaid, did assault, beat, and wound, certain members of the said congregation, viz. *Jacob Lex*, *William Wagner*, *George Witman*, and *G. G. Cope*, for the better carrying the said unlawful and oppressive conspiracy, combination, confederacy, and agreement, into effect and execution, to the great damage, oppression, and grievance, of the members of the German Evangelical Lutheran Congregation in and near *Philadelphia* aforesaid, to the evil and pernicious example of all others, in the like case offending, and against the peace and dignity of the Commonwealth of *Pennsylvania*.    The second count was for conspiracy only, without laying any overt act.    The jury found the defendants guilty on both counts.

A motion was made for a new trial, in support of which several reasons were assigned.

1st, The first reason was, that the Judge before whom the cause was tried, did not explicitly instruct the jury whether a certain bye-law of the 21st *December*, 1805, vesting the president of the corporation with power to appoint inspectors of the election of vestrymen, &c. was, or was not, a valid bye-law, although he was requested so to do.

2d, That the Judge's opinion, so far as it was expressed, was erroneous in point of law.

3d, That the Judge refused to permit the defendant's counsel to put a certain question to *Henry Heyl*, one of the witnesses examined on the trial.

4th, That the Judge refused, declined, or omitted, to express his opinion explicitly upon the legal import and quality of a paper called " The German Petition ;" and that so far as his opinion was expressed, it was erroneous.

5th, That the verdict of the jury was contrary to law and evidence.

1817.

The Commonwealth
v.
EBERLE
and others.

On the trial of the case, it appeared in evidence, that ever since the foundation of this congregation, their church service had been wholly in the German language. But of late years, they had been divided into two parties. One party (the prosecutors in this indictment), were for introducing the English language under certain modifications, so as not to exclude the German. The other party (the defendants), were for adhering to the German language exclusively. Some time in the spring or summer of 1815, a petition was presented to the congregation, praying for the use of a school house in the Northern Liberties, for the purpose of having the church service performed in the English language. This petition was rejected, and appeared to have excited violent suspicions, and strong animosity in the German party. Matters remained quiet, however, till the month of *September*, when those who were in favour of the English language, called a meeting for the purpose of devising measures for obtaining from the corporation, permission for the introduction of English in conjunction with the German. This meeting was first intended to be at the school-house in *Cherry* street, on the 21st *September*, but was afterwards changed to the 25th, in consequence of a meeting in the same house, on the 21st, of a society called " The Mosheim Society," the members of which, in general, were of the German party. At a meeting of the Mosheim Society, it was mentioned that the English party were in motion, and in order to counteract and defeat them, it was proposed that a numerous meeting of members of the German Lutheran Congregation should be called on the 21st *September*. A meeting was accordingly had on the 21st ; and they adjourned to meet again on the 25th, the very night which the English party had appointed for their meeting. On the evening of the 25th, both parties held a meeting. The Germans agreed upon an address, to be presented to the corporation, against the English language, and then broke up. Some of them went into the room, where their adversaries were assembled, behaved rudely, disturbed their deliberations, and were guilty of some acts of violence. It appeared clearly, that the English party were in consternation, and broke up precipitately, but not until they had appointed a committee, to

1817.

The Com-
monwealth
*v.*
EBERLE
and others.

draw up an address to the corporation, in support of their claim.   Each party presented an address to the corporation. That of the Germans, was the paper called, "The German Petition," concerning the legal import of which, the Judge's opinion was desired at the trial.   It was one of the principal matters, relied on by the prosecutors, in support of the indictment.  The petitioners, after expressing, "their liveliest "displeasure at the inconsiderate undertaking, to introduce "a strange language into their church," declared, that they "are determined, (as they had also firmly bound themselves "before God, and solemly to each other), to defend with "their *bodies* and *lives,* their German divine worship, against "every attack, and to oppose with all their power, the intro- "duction of a strange language into their church."   They also prayed the corporation, "not again to let it be brought "to an election, whether the English divine service should "be introduced in their German churches or not."   They further prayed them, "to make such arrangements, that the "opponents to the German language, and German divine "worship, may never be permitted to meet in their school "house, for the attainment of their *base views ;* because they "themselves would thereby give them the means in hand "for their destruction."   And finally, in the most warm and solemn manner, they adjured the corporation to grant their request, and assured them that they would, "with all their "power, yea, with *body* and *life,* support them in all such "measures, as may tend to the welfare, the advancement, "and perpetuity, of their German divine worship."

Meetings were held by the German party on the 6th *October*, at the school-house in the Northern Liberties, and on the 9th, at the girls' school-house in this city.   At these meetings there was warm and intemperate language, and resolutions were entered into, which were presented to the corporation on the 11th of the same month, and entered on their minutes.   The third resolution was in the following terms.   "Should members be found in the corporation who "declare themselves for the English and against the Ger- "man, we then hold such as *covenant and duty breakers*, and "do not acknowledge them for the future as lawful and "official members of the corporation."   The fourth resolution was as follows.   "If such members are found in the corpo- "ration who are for the English and against the German, we

"hold and declare from this day the corporation not full in
"number, and therefore, also, all which it resolves, as null
"and nothing; because, as before said, the corporation, with-
"out being full in number, can undertake and do nothing."
By the eighth resolution, "it is desired, that this writing be
"entered *verbatim* in the protocol," (or book of minutes.)

1817.

The Com-
monwealth
*v.*
EBERLE
and others.

There was evidence, that at other meetings of the English
party in the month of *October*, they were disturbed by the
Germans.   It was proved also, by the oath of *Charles Eberle*,
that Mr. *Manhardt*, the principal leader in the German side,
told him, that "before it should happen, that they should
"preach *Irish* in their churches, *blood should flow:* that he
"(*Manhardt*) had once made a speech at *Camptown*, and
"stirred up the people, and would do it again."   A certain
*John Dunuk*, (of the same party) said, that "blood should
"flow before *English* preaching was introduced: that they
"would do as had been done in *London*,—have beer in the
"church and fight like bull dogs."   One *Patrick Fligher*
said likewise to *Godfrey G. Cope*, that "blood *should flow* be-
fore their ends were answered."   *Christian Smith*, an active
German partisan, used very intemperate language on several
occasions, and in particular, he called *Henry Burkhart*,
"*Judas;*" and said, that "*he should be hanged.*"

By the bye-law, on the validity of which the Judge refused
to give his opinion, the president of the corporation was au-
thorised to appoint the inspectors and clerks of the election.
Accordingly he did appoint them at the election on the 6th
*January*, 1816.   On the day of election, a motion was made
by Mr. *Witman*, (of the English party,) that *John Geyer* and
*William Wagner* should be appointed inspectors, on the prin-
ciple of the bye-law being void; in support of which he pro-
duced the opinion of the attorney general.   A vote was
taken on this motion; and the English party contending, that
it was carried in the affirmative, Mr. *Wagner* attempted to
enter within the railing; a place appropriated for the inspec-
tors' seats.   He was forcibly opposed by the German party;
in consequence of which, some tumult and acts of violence
ensued.

Witnesses were called on behalf of the defendants, to prove
that the words *with body and life*, in the German petition,
were used figuratively, and meant in the German tongue no-
thing unlawful: but merely great earnestness.   *Jacob Mech-*

*lin* had been examined on behalf of the prosecution. The defendants, afterwards, offered *Henry Heyl* to testify as to what he had heard *Mechlin* say of the views and intentions of the English party. The Judge having inquired, whether his evidence was offered in order to discredit *Mechlin*, and the defendants answering in the negative, the testimony was rejected.

*S. Levy* and *Rawle*, in support of the motion for a new trial.

*Binney* and *Ingersoll*, contra.

TILGHMAN C. J. It appears by the Judge's report that he did decline giving a positive opinion on the validity of the bye-law, conceiving that it was not necessary to do so. He declared at the same time that he had great doubts of its validity, and seemed to incline against it. With respect to the German petition, the Judge seems to have delivered his sentiments in terms sufficiently explicit. In order that the reasons for my opinion may be understood, it will be necessary to enter into the evidence in some detail. (Here the Chief Justice recapitulated the evidence before stated.) It is contended on the part of the defendants, that the bye-law was good, and therefore they had a right to use as much force as was necessary to repel Mr. *Wagner*, who was illegally attempting to take his seat as an inspector. I shall take the law to be so, which is all the defendants can ask. It follows then that the acts of violence which took place at the election are to be thrown out of the case. But it remains to be considered, whether the evidence was sufficient to convict the defendants of the conspiracy? If it was, there ought not to be a new trial, although the verdict, so far as concerns the acts of violence, may have been improper; because the Court in passing sentence may take that matter into consideration. A motion for a new trial is an appeal to the discretion of the Court. Unless injustice be the consequence of the verdict, a new trial should not be granted. The German petition is relied on as evidence of conspiracy. The original is in the German language, and gentlemen of respectability and learning were called at the trial to prove that the German words, the literal translation of which into English is *with body and*

*life,* are not to be taken, according to the German idiom, as
any thing more than a bold figurative expression, denoting
great zeal and ardour.  But granting that the words may
bear this meaning, it cannot be denied that the same words
which may bear a figurative meaning may also bear a literal
meaning, if so intended by the speaker; and whether the
intent was to use them figuratively or literally, is to be ascer-
tained from other words and actions of the speaker relative
to the same subject at other times.  If all the other speeches
and actions of the persons who signed the petition had been
such as evinced a desire to avoid bloodshed, it might have
been fairly concluded that the words in the petition were
used figuratively.  But what shall we say to the menaces
of blood used on other occasions by several of the same
party?-what shall we say to their actual disturbance of the
English party when quietly assembled at the school-house?
and what to those resolutions which disfranchised all mem-
bers of the corporation who should be in favour of intro-
ducing the English language?  The German Lutheran Con-
gregation have the right of worshipping God in what lan-
guage they please. . No power on earth can lawfully force
the English language upon them.  Nor can any power with-
hold from them the use of that language, if they choose to
adopt it.  Their charter confines them to no language; it
is the affair of the congregation, to be decided by themselves .
only.  What are we to understand by the declaration of part
of the congregation, that they will consider the places of
those officers who are in favour of English preaching as va-
cant?  If their places are vacant, the acts of the corporation
may be void for want of a *quorum:* and all this without the
decision of any court of justice, but by the will of indivi-
dual members, assembled without authority.  What are we
to understand by the request that the corporation will not
suffer the question of English preaching to be decided
by the votes of the corporation?  If not by votes, how is it
to be decided otherwise than by force?  Suppose now that the
jury who convicted the defendants coupled together these de-
clarations, these resolutions, and those intemperate speeches
proved to have been made by various persons and on various
occasions, and deduced from the whole an inference that it
was seriously agreed on to exclude the English language at
all hazards; who can say that they were clearly in the

1817.

The Com-
monwealth
*v.*
Eberle
and others.

wrong? It is certainly more than I feel myself justified in saying. But the defendants complain of the hardship of charging them with all the rash and violent speeches of a few individuals. Such however is the law, and it is founded in good reason. You cannot affect one man by the speeches of another, until you have proved that they were engaged in a common enterprise. That being proved, the words of one are evidence against the other, but not conclusive. It was in the power of the jury, if they found any thing which distinguished the case of some of the defendants from the others, to have acquitted them. But they have made no distinction, and there is nothing which warrants the Court in doing it. I perceive no sufficient ground therefore for a new trial, either in the Judge declining to decide peremptorily on the bye-law, or in any thing which he said respecting the German petition.

Another reason assigned in favour of the motion is, that the verdict was against evidence. This seems to be a reason generally alleged as matter of course ; and in the present case I consider it as put in merely that the counsel might not omit any thing which might possibly make in their favour. The evidence in this cause was not without contradiction ; as will always happen where many witnesses are called, on an occasion which excites strong feelings. On their credibility it is the province of the jury to decide ; a province which I gladly yield to them, and shall never be disposed to invade. They have decided, and so let it rest.

One more objection has been made to the Judge's opinion on a point of evidence. *Jacob Mechlin* had been called and examined as a witness for the prosecution. After he had given his evidence, it was proposed to examine *Henry Heyl,* another witness, as to what he had heard *Mechlin* say of the views and intentions of the English party. The Judge asked whether the question was proposed with a view of discrediting *Mechlin*'s testimony, and being answered that it was not, he rejected the evidence. The Judge likewise told the defendant's counsel, that if they would prove that *Mechlin* was connected with the prosecutors, he would admit the evidence. It is now said that it had been proved before that *Mechlin* was connected with the prosecutors, and therefore the evidence should have been admitted. But it seems the Judge did not think it had been proved, and when he

called for the proof, the counsel should have adverted to it, and by not doing so, they relinquished it. Besides, I am not satisfied, that the evidence was admissible on any ground, but that of discrediting *Mechlin*. He had been sworn, and might be asked, on his oath, as to any thing he knew of the views of the prosecutors. He is himself no party to this prosecution; and those who are, have a right to insist, that what he says, he shall say upon oath. After that, his declarations may be proved by way of discrediting him. The evidence appears to me, therefore, to have been properly rejected.

These are all the objections which have been taken to the verdict. I cannot say, upon the whole, that justice demands a new trial, and therefore I am against it.

YEATES J. It has been urged on the part of the defendants, by their counsel, that this case was prejudiced by my blending certain historical facts in my charge, respecting the celebration of divine worship in the German Lutheran churches in the English language. It cannot be forgotten, that it was contended on their behalf, that the right of using the German language, *exclusively*, in the public service of their churches, was secured to them by their two charters, and that they were incorporated by the name of " The Mi-" nisters, Vestry-men, and Church-wardens, of the *German* " Lutheran Congregation in and near the city of *Philadel-*"*phia.*" The address of the committee in favour of English preaching, of 28th *January*, 1805, to the corporation—the acts of the corporation thereon, of the 28th *February* following, and their answer to the committee of the 2d *March*, together with a counter representation the same year, against the use of the English tongue in their religious exercises, were read in evidence. Testimony was also given, that several of the adherents to the worship of the Deity in the German language *solely*, branded their opponents with a breach of their oaths and solemn covenants, in attempting to introduce the *partial* use of the English tongue into their religious worship. The counsel on both sides remarked fully on this evidence, and deduced such arguments from it as suited their respective purposes. Under such circumstances, I could not, without manifest impropriety, avoid delivering my sentiments on the litigated points, and the grounds on which they were formed. I took occasion to inform the jury, that

1817.

The Commonwealth
v.
EBERLE
and others.

1817.

The Commonwealth
v.
EBERLE
and others.

the term *German*, in the two instruments of incorporation, was mere matter of *description;* and that the principle has been established by us on full consideration in the case of the Roman Catholics of the Holy Trinity Church in Spruce street. I further brought to their recollection what had been done in German Lutheran Churches, both here and at *Lancaster*, favourable to English praying and preaching. I recommended to those who opposed public worship in English on conscientious scruples *alone*, to consult their bibles, confessions of faith and catechisms, and to determine deliberately for themselves. Yet, while with the single view of preserving the union and peace of the church, I asserted my *private* opinion, I explicitly declared to the jurors, that the Councils of the Lutheran Churches *alone*, were the *exclusive* judges whether any other than the German language should be used in their public prayer or discourses. It has also been said, that I gave no explicit opinion, whether the bye-law of 21st *December*, 1805, was valid or not, although I was requested so to do by the defendant's counsel. A bye-law may be good in part and bad in part. The reasons for my conduct in this particular are stated in my charge, to which I again refer. They were satisfactory to my own mind. It did not appear to me to be essentially necessary, in order to form a correct verdict on the charge of conspiracy. The innocence or guilt of the defendants, as to the offence for which they were tried, did not depend on the validity or invalidity of that ordinance. It is true it might, if its validity was established, have conduced to shew, that the act of *George Witman* in nominating inspectors to be voted for by the congregation, was unauthorised, and led in a considerable degree to the subsequent disorder and tumult, but the charge was not confined merely to that overt act. The bye-law was read and remarked upon by the counsel on both sides, but no account was given of its passage, nor were the names of the members present entered on the minutes, and it came before me in a questionable shape. It is not necessary for me to adopt the strong language of one of the defendant's counsel, in his argument on the *quo warranto*, that there was no evidence either intrinsic or extrinsic, to shew that two-thirds of the congregation convened, upon due notice given, to enact that ordinance. On this head I will only add, that I put it to the jury to decide on all the evidence, whether, view-

1817.

The Commonwealth
v.
EBERLE
and others

ing the conduct of *Witman* on the election day in the most unfavourable light, it could justify the acts or declarations of those who had been styled the German party. .

Nothing is clearer to me, than that I could not legally permit the question to be put to *Henry Heyl*, of what *Jacob Mechlin* told him, as to the views and objects of the English party in carrying on this prosecution. The defendants' counsel openly avowed, that they did not mean to discredit *Mechlin*'s testimony thereby. *Mechlin* had been examined as a witness for the commonwealth, and the views and objects of the English party might have been inquired into, if he knew them; or if he did not, he might have been asked, whether he had communicated them to *Heyl*. If he had denied the latter, *Heyl* might have been produced to contradict him. Not a single witness had mentioned *Mechlin*'s name before I decided on this point of evidence. I therefore did not deem myself authorised to consider him as the agent of the English party, but expressed my willingness to hear any testimony, which might shew his activity in the business as a leader. In the manner in which the point came before me, I considered the answer to the question proposed as mere hearsay, and that the language of *Mechlin* could not be imputed to the prosecutors without manifest injustice.

As to the legal import and quality of the paper, called *the German Petition*, I had no difficulty in my mind about its construction, nor could I be misunderstood by the jury. It is stated in the reasons assigned for a new trial, that so far as I expressed my opinion, I was mistaken in point of law. The language of the instrument was strong and ardent, and the exceptionable words, "*mit leib und leiben*," were underscored in the original; of the plain literal signification of those words there was no doubt. Three learned gentlemen testified, that according to their apprehension of the idiom of the German language, the paper contained no threats of violence, but shewed great earnestness in a cause, supposed by the addressers, to be good. Two of them, however, swore, that under certain circumstances, the instrument might be susceptible of a different meaning. Certain acts and declarations of some of those who had signed the instrument, and particularly intemperate expressions of one *Christian Manhardt*, an active partisan, who it was proved had drawn it

1817.

The Commonwealth
v.
Eberle
and others.

up, had been given in evidence by several witnesses. These I supposed would serve by way of context, and have considerable weight in forming a correct judgment of the views and objects of the petitioners. But it was evident, that the minds of both parties were greatly inflamed, that the witnesses were strongly biassed by supposed interests and peculiar wishes. I ventured no opinion on the credibility of the witnesses, but submitted that consideration wholly to the jury. I left it to them to decide, if they believed the testimony, whether force and violence were not intended to be used, in case the addressers should see a fit occasion for it, taking into view the facts preceding it, and all the attendant circumstances. The jury have convicted all the defendants, and I will only add, that on the fullest reflection, I see no reason to disturb their verdict.

GIBSON J. concurred.

Motion for new trial refused.